## CIRCUIT COURT OF PRINCE WILLIAM COUNTY

Republic Financial Services, Inc.,
a/k/a Blue Ridge Insurance Co.

v.

Connie Sue Pennington,
Individually and as
Administratrix of the Estate of
Michael Pennington, Deceased,
and Marcus F. Arban, Sr.,
Administrator of the Estate of
Marcus F. Arban, Jr., Deceased

September 8, 1994

Case No. (Chancery) 33247

By Judge Carleton Penn

In this suit, the plaintiff (hereinafter Republic), an insurance carrier, seeks declaratory judgment as to whether Republic has a duty to defend a law action pending in this Court under the style of *Connie Sue Pennington, Individually and as Administratrix of the Estate of Philip Michael Pennington, Deceased v. Marcus F. Arban, Sr., Administrator of the Estate of Marcus F. Arban, Jr., Deceased,* and whether there is any duty to pay any judgment which may be obtained in that suit. The Court is of the opinion that Republic is under no such duty in either regard.

The defendant Pennington herein is the widow and personal representative of a police officer, Michael Pennington, who was killed in line of duty by Marcus F. Arban, Jr. (hereinafter Arban), the decedent of the other defendant. Arban was thereupon killed by other police officers. She seeks damages for her husband's death in the underlying action, which has been stayed until this declaratory judgment suit has been adjudicated.

The circumstances that preceded the two deaths are little in dispute, as well as those events that transpired in Arlington County that brought about

the presence of the Prince William County Police SWAT team at the residence of Arban, where the deaths occurred.

Personal liability coverage is excluded under Republic's policy covering Arban if the bodily injury is "expected or intended" by the insured. The Court is of the opinion that the bodily injury to Officer Pennington was expected and intended by Arban. He had deliberately brought about an encounter with a police officer in Arlington that enabled Arban intentionally to shoot the officer twice. After returning to his house in Prince William County, he obstructed his residence door upon the arrival of the police. He thereafter armed himself with a handgun after retreating to the lower level of his residence. He pointed the handgun at one of the officers who had forced the door to come into the residence. The officer fired a shot toward Arban that caused splinters to strike Arban, although he said nothing about being injured. After that shot was fired, Arban returned to the foot of the stairway, and the officers backed to the threshold of the front door behind their "body bunker." Officer Pennington endeavored to negotiate with Arban for some time described variously as "10 to 15 minutes" and "15 or 16 minutes." Some of Arban's responses to Pennington "tended to be incoherent — not responsive," asking whether the police were "CIA or FBI." He stated he was a KGB agent and "couldn't be arrested." He had been told that the police were from the Prince William Police Department and that they were not there to arrest him, but to execute a search warrant. Arban held the pistol in his hand throughout the negotiations but did not then point it toward the officers. They endeavored to get Arban to "put the gun down."

Negotiations ended when Arban took a small duffel bag from the foot of the stairway and went to the officers' right and out of sight. In a "few seconds" there was the sound of the action or "slide" of what turned out to be a high-powered rifle. Thereafter, the gun appeared around the wall at the bottom of the stairs. Both of Arban's hands were holding the rifle and pointing it up the steps. Arban did not show the rest of his body. There was a "muzzle flash," and the bullet penetrated the "body bunker," fatally wounding Pennington in the head. Arban then came up the stairs and fired another shot when the two officers that had been behind the shield were gone. It was stipulated that an officer outside of the house "fired the shot that killed Arban inside the storm door at the threshold."

The officers conceded that Arban made no statement of any intent or threat to harm them and that the rifle was not pointed at "an individual officer."

Arban, Sr., testified that his son was a "very timid person." He also related that his son's conduct had been unusual; that they had not spoken for months; and that he had had to leave birthday presents for his son at the son's front door.

Counsel for Arban, Sr., argues that the son was a "deeply disturbed individual." He may have been disturbed and his conduct bizarre, but there was no expert testimony concerning his mental capacity or any mental illness. His sanity is presumed and there was no evidence that he lacked the mental capacity to form requisite intent.

Touching upon the matter of his capacity for intent and deliberation, some hours prior to his killing Pennington, Arban operated his motor vehicle in such manner that he inveigled an Arlington officer into believing that Arban was a motorist needing assistance, causing that officer to come within range of Arban's firearm, and then shooting the officer.

There is a manifest inference of a rational act to be drawn from Arban's car having been backed into his front yard, with shrubbery at the rear of the vehicle. Its rear window had been partially blown out by the Arlington officer's gunfire. (Defendant's Exhibit # 3.)

Arban placed a safe to barricade his front door. He retreated to his basement when his pointing a handgun at officers in his house brought about a gunshot in his direction. He went out of sight, discarded his handgun, and loaded a high-powered rifle after having observed the "body bunker" for some while. He did not hold the rifle to exhibit it to the officers around the wall at the foot of the stairway but rather pointed the weapon up the stairway to where he had last seen the officers seconds before. His memory of their location and the pointing of the weapon were accurate. Only after the weapon was pointed was the gun fired, another deliberate act, and one that might be reasonably intended to penetrate the "body bunker."

Arban, Sr., suggests that there has been no showing that the discharge of the rifle was other than accidental. For the reasons just stated and for the further reason that there was no evidence of accidental discharge, the Court rejects that contention. Republic was required to rebut hypotheses of accident, lack of intent, or unexpected injury that flowed from the evidence, but not from the imagination of counsel.

Further evidence of Arban's capacity to deliberate and of his intent to injure the officers is his having come to the top of the stairway and to the threshold of the storm door, where he fired another shot after Pennington and the other officer were out of the residence.

The evidence plainly demonstrates Arban's capacity to deliberate, and it is reasonable to infer that every person intends the natural and probable consequences of his acts.

I am of the opinion that *Johnson v. Insurance Co. of North America*, 232 Va. 340 (1986), is controlling on this point.

The Court is of the further opinion that written notice of the occurrence as soon as was practical was not given to Republic or its agent pursuant to the terms of the policy.

The date of the "occurrence" was November 22, 1990. The first written notice to Republic (apparently formal notice) was April 1, 1992. It received a copy of the Motion for Judgment filed on March 11, 1992, in the underlying suit, with a handwritten note of Cox Insurance Agency, an independent agent that had the policy issue.

Republic and Pennington stipulated that were Mr. Mardula to testify, he would state that he received a telephone call from Michael A. Kernbach (representing Mrs. Pennington) on October 18, 1991, in which Mr. Kernbach stated he was filing a claim against the Estate of Marcus Arban, Jr. On the same day Mr. Mardula telephoned the Cox Agency and notified them of a claim against the Estate of Marcus Arban, Jr. He requested a copy of the insurance policy and received a policy from Cox, marked "Blue Ridge Insurance Company."

Arban, Sr., knew of the occurrence and qualified as his son's administrator. He testified that he was not aware during 1990 of a claim against the estate for the officer's death; that he knew of Republic's coverage in February, 1991, and that he had received a phone call from Mardula stating another attorney had called him and stated an intent to make a claim against the Estate. Arban, Sr., conceded that he knew of the event prior to February, 1991, but did not notify Republic.

There is no evidence why Arban, Sr., particularly as an Administrator, did not notify Republic in a timely way. The delay from November, 1990, to March, 1992, constitutes non-compliance with the policy provisions.